PAULIPHY PREVOST AND JOAN PREVOST, Plaintiffs

v.

HESS OIL VIRGIN ISLANDS CORPORATION, Defendant

Civil No. 1984/195

District Court of the Virgin Islands

Div. of St. Croix

March 8, 1988

JOHN R. COON, ESQ., St. Croix, V.I., *for plaintiffs*

NANCY V. YOUNG, ESQ. (LAW OFFICES OF BRITAIN H. BRYANT), St. Croix, V.I., *for Hess Oil Virgin Islands Corporation*

O'BRIEN, *District Judge*

## MEMORANDUM OPINION

The question we decide herein is whether federal labor laws preempt application of the borrowed servant defense to the exclusive remedy provisions of the Virgin Islands Workmen's Compensation statute. We conclude that they do not, and because no other facts are in dispute, this case must be dismissed.

## I. FACTS AND PROCEDURAL BACKGROUND

The circumstances under which this matter comes back to us can be gleaned from Prevost v. Hess Oil Virgin Islands Corp., 640 F. Supp. 1220 (D.V.I. 1986) ("Prevost I"), rev'd and remanded sub nom. Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237 (3d Cir. 1987), cert. denied, ---- U.S. ---, 108 S.Ct. 452 (1987).

The Third Circuit remanded the matter for us to decide the factual question whether the plaintiff, Pauliphy Prevost, was the borrowed servant of the defendant, Hess Oil Virgin Islands Corporation ("HOVIC") for purposes of the exclusive remedy provision of the Virgin Islands Workmen's Compensation statute ("statute"), 24 V.I.C. § 251 et seq., such that this suit is barred. See Nieves, 819 F.2d at 1252–53. It had been recognized in Vanterpool v. Hess Oil Virgin Islands Corp., 589 F. Supp. 334 (D.V.I. 1984), modified, 766 F.2d 117, 127–28 (3d Cir. 1987), cert. denied, 474 U.S. 1059, 106 S.Ct. 801 (1986) that the borrowed servant doctrine ("doctrine") was applicable in the context of workmen's compensation to preclude a personal injury suit brought by a borrowed worker against an employer to whom he agreed to be loaned.

The Vanterpool holding predicated the doctrine's application upon an express or implied contract of hire between the borrowed employee and the borrowing employer. 766 F.2d at 128. It was repudiated by statute in 24 V.I.C. § 263(a). However, in Nieves, retroactive renunciation as to this and other cases pending at the time was held a violation of the Contracts Clause. Art. I § 10, cl. 1 of U.S. Constitution, as applied to the territory by the Revised Organic Act of 1954, 48 U.S.C.A. 1561 (Supp. 1987). 819 F.2d at 1252.

Now once again faced with summary judgment on this factual issue, Prevost does not claim he was not HOVIC's borrowed servant. Rather, he argues that the federal labor laws pre-empt application of the borrowed servant defense to his tort suit.

Specifically, Prevost suggests that the federal labor laws preclude the independent contract for hire, he, by necessity, had to have entered into with HOVIC in order to have become HOVIC's borrowed servant. He refers us to Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1984).

Secondly, he claims that HOVIC and Litwin Panamerican Corporation's ("Litwin") application of the borrowed servant status to his employment is an unfair labor practice under the provisions of the National Labor Relations Act ("NLRA"), and is within the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). He contends that HOVIC's defense is, therefore, pre-empted from our consideration. He cites San Diego Building Traders Council. v. Garmon, 359 U.S. 236 (1959).

He also turns our attention to the doctrine enunciated in Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S.

132 (1976). He argues that this pre-emption precludes territories from regulating this very aspect of employer-employee relations.

Prevost makes these three arguments by reference to the 1983 collective bargaining agreement ("CBA") entered into on his behalf by the United Steelworkers of America, local 8248 ("local") with his employer, Litwin.[1] He specifically points us to article 22 of the agreement which reads:

> The Company [Litwin] shall not enter into any separate agreement with any employee in the bargaining unit, or with any other organization for the employees involved herein, with respect to any terms or conditions of employment.

He contends that this section preserves the prohibition against individual employee contracts and precludes interference with the local's status as the exclusive bargaining agent on behalf of the unit members like himself. This assertion is made notwithstanding his concession that pursuant to Article 4 of the CBA, Litwin had the right to assign him to work for HOVIC.[2]

The interference to which Prevost refers is embodied in the HOVIC/Litwin maintenance agreement which in effect is an assignment of employees to HOVIC and which has been described as follows:

> In 1976, Hess and Litwin entered into an agreement, amended in 1980, whereby Litwin was to provide personnel to perform general maintenance and turnaround work at Hess' St. Croix refinery. Under the agreement, Litwin workers were divided into two classes. Employees in the class involved here, Type-I personnel, were furnished "as loanees under HOVIC's direction and control in the numbers and by skills as ordered from time to time by HOVIC." Hess assumed "direct supervision, direction

---

[1] Although the CBA at issue was entered into in 1983, at oral argument Prevost suggested that the history of the agreement stems from the 1960's. There is nothing in the record to reflect this.

[2] Article 4 in pertinent part states:

Section 4.1—*The Union recognizes and agrees that the operation and direction of the working force including the right to hire, suspend, transfer, discipline, or discharge for proper cause ... and the right to transfer, promote, demote or relieve employees from duty because of lack of work, or reduction of work force or schedule reduction of work force are the sole prerogative of the company.*

\*      \*      \*

Section 4.2—It is further agreed ... *that employees will perform any duties to which they may be assigned.* (Emphasis added.)

and control" over these employees, and Litwin was not "responsible to HOVIC or liable for the workmanship of such personnel or for any mistake, error or act of negligence of such personnel." Litwin was responsible for maintaining "at its own expense" Virgin Islands workmen's compensation insurance and employer's liability insurance against common law claims.

*　　*　　*

Nieves, 819 F.2d at 1239–40; see also, Vanterpool, 766 F.2d at 119–20. We, however, do not read Prevost's objections as to the maintenance agreement itself, but the application of the doctrine to it in light of the CBA.[3]

## II. DISCUSSION

Federal labor law's pre-emption of state law in this field represents the limits Congress has placed upon the "scope of 'state regulation

---

[3] Prevost refers us to the closed matter of United Steel Workers of America v. Litwin Pan American Corporation, Civ. No. 1984/243 (D.V.I.). The stipulation for dismissal of that case read in pertinent part:

It is agreed between the United Steelworkers of America and Litwin Panamerican Corporation as follows:

1. Litwin Panamerican Corporation ("Litwin") will cease including in its Hess Loanee forms the following sentence: "I recognize and it has been explained to me that I will be an employee loaned to HOVIC and if I am injured while I am loaned to HOVIC, even though paid by Litwin Panamerican, I will not be able to sue HOVIC or Litwin Panamerican and may be confined solely to Workmen's Compensation benefits for any injury or death I may sustain." Litwin will not include in any Hess Loanee forms in the future any language intended to have the same effect as the foregoing quoted sentence.

2. All prior Hess Loanee forms bearing the sentence quoted in paragraph 1 above are hereby deemed rescinded, null, void and of no legal effect. Litwin will destroy all prior Hess Loanee forms signed by its employees which bear the sentence quoted in paragraph 1. Litwin may ask employees to sign new Hess Loanee forms to replace those destroyed and such forms will contain the language set forth in Exhibit A.

3. Litwin will not attempt to obtain or establish, in writing or orally, any consent or acquiescence by its employees to forego any rights they may have to sue third parties for injury or death. Litwin will not attempt to establish as a term or condition of employment that employees forego any rights they may have to sue third parties for injury or death.

*　　*　　*

5. The United Steelworkers of America will dismiss with prejudice the charge against employer filed with the National Labor Relations Board, Case No. 24-CA-5009, will dismiss with prejudice the civil action filed in the United States District Court of the Virgin Islands, Division of Saint Croix, on August 14, 1984, against Litwin and will dismiss with prejudice the grievance filed against Litwin on July 6, 1984, by Norris Barnes.

of activity touching upon labor-management relation'." New York Tel. Co. v. New York Dept. of Labor, 440 U.S. 519, 527 (1979) (quotation omitted). Specifically two pre-emption doctrines exist under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq. Golden State Transit v. City of Los Angeles, 475 U.S. 608, 106 S.Ct. 1395 (1986) (citing Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380 (1985)). The Garmon doctrine prohibits states or territories from "'regulating activity that the NLRA protects, prohibits or arguably protects or prohibits'." Golden State Transit, 106 S.Ct. at 1398 (quoting Wisconsin Dept. of Industry v. Gould, Inc., 475 U.S. 282, 106 S.Ct. 1057 (1986)). The Machinists pre-emption precludes state or territorial regulations "concerning conduct that Congress intended to be unregulated'." Golden State Transit, 106 S.Ct. at 1398 (quoting Metropolitan Life Ins., 105 S.Ct. at 2394).

In addition to these two pre-emption doctrines flowing from the NLRA, federal common law developed pursuant to section 301 of the Labor Management Relations Act ("LMRA") 29 U.S.C.A. 185(a), pre-empts state law in the area of interpreting collective bargaining agreements. See Lueck, 471 U.S. at 209–10.

> . . . [q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort . . . .

Lueck, 471 U.S. at 211.

Because application of each of these three pre-emptions is asserted by Prevost, we discuss each seriatim.

A) *Garmon Doctrine*

The Garmon doctrine prevents states from regulating activity which the NLRA "protects, prohibits or arguably protects or prohibits[,] [b]ecause conflict is imminent whenever two remedies are brought to bear on the same activity." Gould, 106 S.Ct. at 1060

(citations and quotations omitted).[4] Thus, courts lack subject matter jurisdiction and are displaced from applying local rules where the controversy at issue is identical with that which could be presented to the NLRB unless it is one of particular local concern. Belknap Inc. v. Hale, 463 U.S. 491, 510–11 (1983).

Here, however, our resolution of HOVIC's defense is not one which would substantially conflict with a remedy that might be provided by the NLRB even assuming the existence of an unfair labor practice as asserted by Prevost.[5] This is because our focus is not upon the local's relationship with Prevost's employer, but upon the territory's interest in applying the exclusive remedy provision of the statute. In this regard, the Third Circuit has recognized the inapplicability of federal labor law to rights afforded under workmen's compensation statutes. See Herring v. Prince Macaroni of New Jersey, 799 F.2d 120, 124 n.2 (3d Cir. 1986).

More importantly, we are dealing with a personal injury matter brought pursuant to territorial law. Even if HOVIC were Prevost's joint employer or even a party to the CBA, there is nothing protected

---

[4] For example, the Gould Court faced a Wisconsin statute which precluded state procurement agents from purchasing any product manufactured or sold by any person on a list of known labor law violators. Id. at 1060. In holding the law pre-empted by the NLRA, the Supreme Court wrote:

Because Wisconsin's debarment law functions unambiguously as a supplemental sanction for violations of the NLRA, it conflicts with the Board's comprehensive regulation of industrial relations in precisely the same way as would a state statute preventing repeat labor law violators from doing any business with private parties within the State. Moreover, if Wisconsin's debarment law is valid, nothing prevents other States from taking similar action against labor law violators. Indeed, at least four other States already have passed legislation disqualifying repeat or continuing offenders of the NLRA from competing for state contracts. Each additional statute incrementally diminishes the Board's control over enforcement of the NLRA and thus further detracts from the "integrated scheme of regulation" created by Congress.

106 S.Ct. at 1062 (footnote omitted).

[5] Since HOVIC is not a party to the CBA, and because unfair labor practice provisions of the NLRA are only applicable to employers or labor organizations, see Branch 6000, Nat. Ass'n of Letter Carriers v. N.L.R.B., 595 F.2d 808, 811 (D.C. Cir. 1976), HOVIC would first have to be held Prevost's joint employer. The test is set out by the Third Circuit in N.L.R.B. v. Browning Ferris Industries, 691 F.2d 1117, 1122–24 (3d Cir. 1982). We do not reach this issue, or the question whether Litwin's actions in this regard falls under the unfair labor practice provisions, because our conclusion rests upon the assumption that even if there was an unfair labor practice, our jurisdiction is not pre-empted under Garmon. We do note that it is an unfair labor practice to disregard bargaining representatives by negotiating with individual employers with respect to working conditions. See Medo Photo Supply Corp. v. NLRB, 321 U.S. 678 (1944).

400

or arguably protected by the NLRA in HOVIC's conduct (negligence) for which Prevost complains. It is clear that if confronted with the issue before us, the NLRB would have no authority to suspend enforcement of a state regulatory scheme which has general application. See, e.g., Metropolitan Life, 105 S.Ct. at 2397. As the Vanterpool court noted, ". . . where the scheme is mandatory it conditions all employment." 766 F.2d at 126.

By focusing upon the implicit contract nature of the doctrine, Prevost is misguided. This is because, as can be garnered from the Third Circuit discussion in Vanterpool, the inquiry for determining the applicability of the doctrine to the statute is primarily focused upon actions of the loaned employee. See generally, 766 F.2d at 122. Possible NLRB sanctions vis-a-vis Prevost's employer, whether it be HOVIC or Litwin, for committing an unfair labor practice, would have no effect as to determining whether Prevost became HOVIC's borrowed employee by operation of territorial law. There is simply no conflict with the NLRB's focus which is upon the relations between the local and the employer, and the concern of the territory in the implementation of its statute. We presume that it is for this and similar reasons that the Circuit in Herring noted that workmen's compensation statutes are not pre-empted by federal law. 799 F.2d at 124 n.2.

Therefore, because determination of the scope of the workmen's compensation scheme is clearly a matter within the ambit of a court of local concern, and sitting as we do as a local court in this matter, we address it, not the NLRB, unless foreclosed by the Machinists doctrine.[6]

B) *Machinists Doctrine*

Although the Garmon doctrine precludes state regulation of activity governed by the NLRB, the Machinists doctrine precludes state regulation where Congress intentionally left the area to be effected by the free flow of economic forces. Golden State, 106 S.Ct. at 1398 (quotation omitted). "States are, therefore, prohibited from imposing additional restrictions on economic weapons of self help unless such restrictions presumably were contemplated by Congress." 106 S.Ct. at 1399.

---

[6] We recognize that certain defenses may be pre-empted by federal labor law. Milk Drivers & Dairy Employees Union v. Vevoda, 772 F.2d 530 (9th Cir. 1985); cert. denied, — U.S. —, 106 S.Ct. 1246 (1986). Here, however, HOVIC's defense does not require the Court to scrutinize dealings between the local and the employer which is by necessity within the NLRB's primary jurisdiction.

A discussion of the Machinists doctrine case was made in Metropolitan Life. There the Supreme Court faced the issue whether a Massachusetts statute providing for mandatory minimum mental health care benefits was pre-empted by the federal labor laws when applied to collective bargaining agreements. Id. at 2383. In reaching its decision, the Court first noted that Congress never considered the question whether state laws of general application affecting terms of collective bargaining agreements were to be pre-empted. Id. at 2390. It wrote in this regard:

> The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment. Neither inequality of bargaining power nor the resultant depressed wage rates were thought to result from the choice between having terms of employment set by public law or having them set by private agreement. No incompatibility exists, therefore, between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA.

> \*     \*     \*

> Minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right of self-organization established in the Act. Unlike the NLRA, mandated-benefit laws are not laws designed to encourage or discourage employees in the promotion of their interests collectively; rather, they are in part "designed to give specific minimum protections to individual workers and to ensure that each employee covered by the Act would receive" the mandated health insurance coverage. Nor do these laws even inadvertently affect these interests implicated in the NLRA. Rather, they are minimum standards "independent of the collective-bargaining process [that] devolve on [employees] as individual workers, not as members of a collective organization.

Id. at 2397 (citation and quotation omitted).

The Court went on to add that states have broad power to regulate the employment relationship to protect workers within the state.

It pointed out that workmen's compensation statutes have been of the group which have survived scrutiny. Id. at 2398 (citation omitted).

Here we face a territorial statute which provides mandated benefits in exchange for common law tort remedies. The Third Circuit wrote in Vanterpool that the Virgin Islands Act "is intended to provide an injured employee with certain and absolute benefits in lieu of possible and speculative common law benefits obtainable only in a tort action against his employer." 766 F.2d at 122. We view application of the doctrine as merely an extension of that rule to the borrowing employer.

In so concluding, we note that it is clear that there is nothing inconsistent between policies behind the exclusive remedy provisions in the statute and the NLRA's goal of equating bargaining power between management and labor. Its application may affect the terms of Prevost's employment, but it "does not limit the rights of self organization or collective bargaining protected by the NLRA . . ." 105 U.S. at 2399. This is simply not a case as the Supreme Court faced in Golden State, 106 S.Ct. at 1395, where the state's action affected the union power to strike and to apply economic power to obtain bargaining concessions from management such that the balance of power between union and manager was affected.

More importantly, the application of the doctrine to the statute's exclusive remedy provision does nothing to alter this balance of power between management and labor. While Prevost does not ask us to hold the exclusive remedy provision of the statute pre-empted in toto, his assertion that the doctrine's application to the statute is barred as to him, implicates the same concerns. Simply put, he asks us to void this protection of employees arising from territorial law merely because they are party to a collective bargaining agreement. We see nothing in the policies of the NLRA which requires nor mandates this distinction.

This is not a case where state law provides different benefits depending upon an employee's union status. See, e.g., United Steelworkers of America v. Johnson, 799 F.2d 402 (8th Cir. 1986). Thus, we view it in line with Metropolitan Life, and hold that the doctrine as applied to the exclusive remedy provisions of the statute is not pre-empted by the NLRA. We now turn to the question of federal common law pre-emption.

C) *Federal Common Law*

Here we face a pre-emption principle varied from the two NLRA pre-emptions, the effect of section 301 of LMRA. Lingle v. Norge

Div. of Magic Chef, Inc., 823 F.2d 1031, 1042 (7th Cir. 1987) (citing Textile Workers Union v. Lincoln Mills, 353 U.S. 948 (1957)). Specifically, we must consider whether § 301 and the common law developed under its auspices would allow the implied contract of hire implicit in the borrowed servant relationship. Unlike our discussion pursuant to the Garmon doctrine where we looked for conflicting remedies, and the Machinists doctrine where we balanced federal and territorial interests, this question requires us to decide whether application of the doctrine to the exclusive remedy provision of the statute gives way under federal law. Lingle, 823 F.2d at 1042 (citations omitted).

We immediately point out that we do not believe application of the statute, even as applying the doctrine, is affected by federal labor law. The Third Circuit wrote in Herring:

> Because worker's compensation rights are rooted in state law, rather than the collective bargaining agreement, and because the cause of action in question is part-and-parcel of the state's worker's compensation scheme, we do not believe it is pre-empted by federal labor law. See also Peabody Galion v. Dollar, 666 F.2d 1309, 1316 (10th Cir. 1981) (cause of action has nothing to do with union organization or collective bargaining, nor is there tendency to conflict with federal labor law).

799 F.2d at 124 n.2.[7]

Second, even assuming that the application of the doctrine to the statute can be considered from a contract position vis-a-vis the federal labor laws, as opposed to a statutory criteria, we believe there is no inconsistency between the implied contract and the CBA.[8] This is because nothing in article 22 of the CBA as referred to us by

---

[7] The Circuits are split as to whether section 301 pre-empts a suit brought pursuant to a state workmen's compensation statute granting an employee a cause of action against his employer where the employer has discharged him for filing a workmen's compensation claim. See discussion Baldracci v. Pratt & Whitney Aircraft Div., 814 F.2d 102, 106 (2d Cir. 1987). But the Third Circuit's discussion in Herring binds us as to relationship between federal labor law and state workmen's compensation statutes.

[8] Although federal common law under section 301 precludes bargaining unit members from negotiating individual contracts inconsistent with their bargaining agreement, Malia v. RCA Corp., 794 F.2d 909, 912 (3d Cir. 1986), cert. denied, — U.S. —, 107 S.Ct. 3210 (1987) (citations omitted), it does not prevent the assertion of contract rights independent of those found in the collective bargaining agreement, so long as the contract relied upon is not a collective bargaining agreement. Caterpillar Inc. v. Williams, — U.S. —, 107 S.Ct. 2425, 2431–32 (1987).

Prevost precludes the implicit agreement at issue,[9] nor are we directed by Prevost to any other provision which does.[10] In fact, the CBA is utterly silent as to employees' common law rights to sue in tort.[11]

Additionally, the implied contract arises over time. Vanterpool, 766 F.2d at 127 (citation omitted). Its existence and terms bear no dependence upon the CBA or its provisions. In short, we view it as independent from the CBA, therefore, within the Caterpillar distinction. Overall, we see no conflict with federal law in this regard.

## III. CONCLUSION

Having found the Garmon and Machinists doctrines respectively inapplicable, and concluding that claims involving workmen's compensation statutes as either not affected by federal labor law, or in this case, sufficiently independent from concerns of federal law, we can dispense with Prevost's legal defense. Because he puts no facts into dispute as to his status as HOVIC's borrowed servant we find, therefore, in line with Vanterpool that HOVIC was responsible for Prevost's working conditions and the attendant risks; that Prevost's employ with HOVIC was of sufficient duration so that Prevost's can be presumed to have acquiesced in these risks after evaluation; and, finally, that the work Prevost performed was HOVIC's work. 766 F.2d at 122. Judgment will enter in favor of HOVIC. See Celotex Corp. v. Catrett, 477 U.S. 313, 106 S.Ct. 2548 (1986).

## SUMMARY JUDGMENT

THIS MATTER is before us on renewed motion by the defendant, upon remand from the Third Circuit, for summary judgment pursuant to Fed. R. Civ. P. 56. Having entered an opinion of even date herewith, and the premises considered, now therefore it is

---

[9] Article 22 prevents Litwin from entering into any agreement with another labor organization or entering into a separate agreement with an employee. It does not limit Prevost's right to contract with HOVIC, and does not bind HOVIC since HOVIC was not a party to the CBA.

[10] Of course, Article 4, see supra at note 2, allows Litwin to assign employees to work at the direction of HOVIC.

[11] See generally, Prevost exhibit A.

ORDERED:

THAT the defendant's motion for summary judgment is GRANTED; and further

THAT the plaintiff's complaint is DISMISSED WITH PREJUDICE.